UNITED STATES of America,
Plaintiff-Appellee,

v.

Edward RODRIGUEZ, a/k/a Rick, Thomas J. Albernaz, Peter Smigowski, and William John Martins, Defendants-Appellants.

No. 77-5339.

United States Court of Appeals,
Fifth Circuit.

Feb. 27, 1980.

Raymond E. LaPorte, Tampa, Fla., for Rodriguez.

Martin G. Weinberg, Boston, Mass., for Albernaz.

James W. Lawson, Joseph S. Oteri, Boston, Mass., for Smigowski.

Joel R. Magazine, Coconut Grove, Fla., for Martins.

Michael P. Sullivan, Asst. U. S. Atty., Miami, Fla., Mervyn Hamburg, Atty., U. S. Dept. of Justice, Crim. Div., Washington, D. C., for the U. S.

Before COLEMAN, Chief Judge, BROWN, GOLDBERG,* AINSWORTH, GODBOLD, CHARLES CLARK, RONEY, GEE, TJOFLAT, HILL, FAY, RUBIN and VANCE, Circuit Judges.**

JOHN R. BROWN, Circuit Judge:

The seizure on the open seas of marijuana being transferred from the freighter *Labrador* to the *Catchalot II* caught a lot more than an enormous amount of an illegal substance. Not the least of the catch are the difficult legal issues of statutory construction and double jeopardy which we consider on this rehearing en banc. The panel in this case disagreed with prior decisions concerning these issues, but felt constrained to follow the existing precedent of this Court. We write today to endorse our existing precedent.

The issues we address concern only the consecutive sentences imposed on defendants Rodriguez and Albernaz[1] for conspiracy to import marijuana, in violation of 21 U.S.C.A. §§ 952 & 963, and conspiracy to distribute marijuana, in violation of 21 U.S.C.A. §§ 841 & 846. Those defendants made an agreement to import and distribute the marijuana, an agreement violating two separate and specific narcotics conspiracy statutes. We first decide that Congress intended for both statutes to apply separately and consecutively to such an agreement. That conclusion nets us a sharp-toothed "double jeopardy" shark; but we find that double jeopardy has little bite where but one trial occurred and congressional intent is clear. The defendants' consecutive sentences under two separate, specific, and narcotics-related conspiracy statutes are affirmed.[2]

The facts are set out in the panel opinion, 585 F.2d 1234.[3] They show that defendants

---

* Judge Goldberg, who participated in the submission of this case, took Senior status as of January 31, 1980 and is therefore no longer qualified to be a member of the Court en banc.

** Judges Kravitch, Frank M. Johnson, Jr., Garza, Henderson, Reavley, Politz, Hatchett, Anderson, Randall, Tate, Sam D. Johnson, and Thomas A. Clark have become members of the Court since January 23, 1979, when this case was taken under submission. They do not wish to participate in the decision.

1. The panel's dispositions with respect to Smigowski and Martins are reaffirmed. Smigowski and Martins stand convicted of violating only 21 U.S.C.A. § 963. On that count, each must serve a sentence of three years imprisonment and a special parole term of two years.

2. We therefore reaffirm in all respects the panel's *disposition* of this case, though not its reasoning.

3. Some twenty tons of marijuana, "far more than the appellants could personally consume in the course of many lifetimes of furious effort . . . ," 585 F.2d at 1246, was seized. Consequently, no question of mere possession for personal use is involved. *See* 21 U.S.C.A. § 844. The Coast Guard and the Drug Enforcement Agency seized the marijuana as it was being off-loaded from the freighter *Labrador* to the *Catchalot II.* Thirteen Colombian seamen aboard the *Labrador* were tried separately and their conspiracy convictions were affirmed in part and reversed in part in *United States v. Cadena,* 585 F.2d 1252 (5th Cir. 1978). The instant case involves four co-conspirators— Rodriguez, Albernaz, Smigowski, and Martins —who arranged the high seas transaction, and other matters, from within the United States.

Rodriguez and Albernaz were involved in an agreement with the objectives of importing marijuana and then of distributing it domestically. For that agreement, the defendants were charged and convicted under two separate statutory provisions. They received consecutive sentences.[4]

The statutes involved in this case are parts of the Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub.L. No.91–513, 84 Stat. 1236 ("Drug Control Act"). Title III of this Act (Subchapter I of Chapter 13 of 21 U.S.C.A.) (entitled "Importation and Exportation") relates to imports and exports of controlled substances. Among its provisions is 21 U.S.C.A. § 952,[5] which defines and prescribes the act of unlawful importation. Title III of the Act (Subchapter II of Chapter 13 of 21 U.S.C.A.) (entitled "Control and Enforcement") relates to internal prevention and control of drug abuse. Among its provisions is 21 U.S.C.A. § 841,[6] which makes it unlawful to distribute controlled substances domestically. Each title of the Act contains its own, identically worded provision prohibiting

---

4. All four were charged in two count indictments. Count I charged conspiracy to import marijuana. The substantive offense of importation is proscribed by 21 U.S.C.A. § 952. Conspiracy to violate § 952 is punishable under 21 U.S.C.A. § 963. Count II charged conspiracy to distribute marijuana. Distribution is proscribed by 21 U.S.C.A. § 841, and conspiracy to violate § 841 is proscribed by 21 U.S.C.A. § 846. Each was convicted by a jury on both counts.

The panel properly found the evidence insufficient to show the involvement of Smigowski and Martins in a conspiracy involving distribution of the marijuana, once it actually reached the United States. Their conviction on Count II was therefore properly reversed. But Rodriguez and Albernaz "perforce had to make some arrangements to dispose of their treasure," 585 F.2d 1247, and those two actually arranged (without the involvement of Smigowski or Martins) to transport, by means of Winnebagos, and distribute the marijuana once it reached shore. The panel therefore properly found the evidence sufficient with respect to both counts of the convictions of Rodriguez and Albernaz.

5. Rodriguez received consecutive four and one-half year terms, totaling nine years, as well as consecutive special parole terms. Albernaz received consecutive three and one-half year terms, totaling seven years and consecutive special parole terms. The length of the combined sentences thus exceeds the maximum five-year sentence under the conspiracy to distribute count alone, 21 U.S.C.A. § 841(b)(1)(B); it also exceeds the maximum five-year sentence under the conspiracy to import count alone, 21 U.S.C.A. § 960(b)(2).

5. (a) It shall be unlawful to import into the customs territory of the United States from any place outside thereof (but within the United States), or to import into the United States from any place outside thereof, any controlled substance in schedule I or II of subchapter I of this chapter, or any narcotic drug in schedule III, IV, or V of subchapter I of this chapter, except that—

(1) such amounts of crude opium and coca leaves as the Attorney General finds to be necessary to provide for medical, scientific, or other legitimate purposes, and

(2) such amounts of any controlled substance in schedule I or II or any narcotic drug in schedule III, IV, or V that the Attorney General finds to be necessary to provide for the medical, scientific, or other legitimate needs of the United States—

(A) during an emergency in which domestic supplies of such substance or drug are found by the Attorney General to be inadequate, or

(B) in any case in which the Attorney General finds that competition among domestic manufacturers of the controlled substance is inadequate and will not be rendered adequate by the registration of additional manufacturers under section 823 of this title,

may be so imported under such regulations as the Attorney General shall prescribe. No crude opium may be so imported for the purpose of manufacturing heroin or smoking opium.

*Nonnarcotic controlled substances in schedules III, IV, or V*

(b) It shall be unlawful to import into the customs territory of the United States from any place outside thereof (but within the United States), or to import into the United States from any place outside thereof, any nonnarcotic controlled substance in schedule III, IV, or V, unless such nonnarcotic controlled substance—

(1) is imported for medical, scientific, or other legitimate uses, and

(2) is imported pursuant to such notification or declaration requirements as the Attorney General may by regulation prescribe.

6. (a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; or

(2) to create, distribute, or dispense, or possess with intent to distribute or dispense, a counterfeit substance.

conspiracy to commit any of the offenses described in that title of the Act:

> Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

21 U.S.C.A. §§ 846, 963. Thus, § 963 punishes conspiracy to import marijuana and § 846 punishes conspiracy to distribute marijuana domestically.

The defendants, Rodriguez and Albernaz, made an agreement with the dual objective of importing and then distributing marijuana domestically. Their conspiracy therefore violated both of the conspiracy provisions of the Drug Control Act. They now contend that the criminal conspiracy in which they engaged cannot subject them to the dual, consecutive sentences which they received.

## I. Congruous Congress

The first question is one of congressional intent, for "it is necessary, following [the] practice of avoiding constitutional decisions where possible, to determine whether Congress intended to subject the defendant to multiple penalties for the single criminal transaction in which he engaged." Simpson

v. United States, 435 U.S. 6, 12, 98 S.Ct. 909, 913, 55 L.Ed.2d 70, 76 (1977).

In Simpson, the Supreme Court dealt with two statutes, enacted at different times, proscribing the act of robbing a bank by using a firearm. The two armed bank robbers there were convicted in one trial of violating both statutes and assessed consecutive sentences. One statute, 18 U.S.C.A. § 2113(d), was enacted as part of the Bank Robbery Act of 1934, Pub.L.No.235, 48 Stat. 783. That Act set up a "carefully crafted hierarchy of penalties,"[7] adding five years to the maximum penalty for bank robbery if a weapon was used, and increasing the penalty still further if a kidnapping or death occurred during a robbery.[8] Since a weapon was used, the robbers received the enhanced penalty set out in the Bank Robbery Act, as codified at 18 U.S.C.A. § 2113(d). The second statute, 18 U.S.C.A. § 924(c), was added by floor amendment to the Gun Control Act of 1968, Pub.L.No.90–618, 82 Stat. 1213. That statute provided for enhanced punishment whenever any felony was committed by use of a firearm.[9] Convicted under this statute as well, the robbers received a second sentence to be served consecutively.

In order to determine congressional intent, the Supreme Court decided to apply "several tools of statutory construction

---

7. United States v. Canty, 152 U.S.App.D.C. 103, 117, 469 F.2d 114, 128 (D.C. Cir. 1972).

8. 18 U.S.C.A. § 2113 (d) & (e):

(d) Whoever, in committing, or in attempting to commit, any offense defined in subsections (a) and (b) of this section, assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device, shall be fined not more than $10,000 or imprisoned not more than twenty-five years, or both.

(e) Whoever, in committing any offense defined in this section, or in avoiding or attempting to avoid apprehension for the commission of such offense, or in freeing himself or attempting to free himself from arrest or confinement for such offense, kills any person, or forces any person to accompany him without the consent of such person, shall be imprisoned not less than ten years, or punished by death if the verdict of the jury shall so direct.

9. Whoever—

(1) uses a firearm to commit any felony for which he may be prosecuted in a court of the United States, or

(2) carries a firearm unlawfully during the commission of any felony for which he may be prosecuted in a court of the United States,

shall, in addition to the punishment provided for the commission of such felony, be sentenced to a term of imprisonment for not less than one year nor more than ten years. In the case of his second or subsequent conviction under this subsection, such person shall be sentenced to a term of imprisonment for not less than two nor more than twenty-five years and, notwithstanding any other provision of law, the court shall not suspend the sentence in the case of a second or subsequent conviction of such person or give him a probationary sentence, nor shall the term of imprisonment imposed under this subsection run concurrently with any term of imprisonment imposed for the commission of such felony.

. . . ." 435 U.S. at 12, 98 S.Ct. at 913, 55 L.Ed.2d at 76. The Court used four tools of construction. The legislative history was "sparse," yet it clearly indicated that the felony firearm statute was not intended to apply to the bank robbery statutes.[10] "[T]he principle that gives precedence to the terms of the more specific statute where a general statute and a specific statute speak to the same concern . . . ," *id.* at 15, 98 S.Ct. at 914, 55 L.Ed.2d at 78, was also invoked. With its hierarchy of penalties and specific focus, the bank robbery statute was found more specific. The specificity principle was viewed as a corollary of a third tool of construction, the rule of lenity. The Court quoted its decision in *Ladner v. United States*[11] : " 'This policy of lenity means that the Court will not interpret a federal criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what Congress intended.' " *Id.* Finally, the Court looked at the conduct of the Government as indicative of the common perception of the statutes, and found that for several years the Department of Justice advised all United States Attorneys not to prosecute under both § 2113(d) and § 924. *Id.* at 16, 98 S.Ct. at 914, 55 L.Ed.2d at 78.

■ *Simpson's* teaching, therefore, is that the difficult task of divining Congressional intent is to be aided by the use of *several* tools of statutory construction.[12] *Simpson* does not limit the tools to be used to the four there used.[13] *Simpson* speaks to statutes proscribing substantive acts, not to conspiracy statutes governing acts of thought and agreement. *Simpson* deals with the interaction between a specific and a general statute, but not with the interaction between two specific statutes. The control of the use of firearms has differed historically and practically from that of narcotics, so again *Simpson* is not dispositive. Nor does it address the enactment of two statutes as a part of one comprehensive Act, an Act designed to pull together widely scattered and disorganized enactments from years past.[14]

Before beginning a formal analysis of the construction to be accorded the Drug Control Act, we pause to examine existing jurisprudence bearing upon the conspiracy provisions of that Act, 21 U.S.C.A. §§ 846 &

**10.** First is the legislative history of § 924(c). That provision, which was enacted as part of the Gun Control Act of 1968, was not included in the original Gun Control bill, but was offered as an amendment on the House floor by Representative Poff. 114 Cong.Rec. 22231 (1968). In his statement immediately following his introduction of the amendment, Representative Poff observed:

"For the sake of legislative history, it should be noted that my substitute is not intended to apply to title 18, sections 111, 112, or 113 which already define the penalties for the use of a firearm in assaulting officials, with sections 2113 or 2114 concerning armed robberies of the mail or banks, with section 2231 concerning armed assaults upon process servers or with chapter 44 which defines other firearm felonies." *Id.* at 22232.

*United States v. Simpson, supra,* 435 U.S. at 13, 98 S.Ct. at 913, 55 L.Ed.2d at 77 (footnote omitted).

**11.** 358 U.S. 169, 178, 79 S.Ct. 209, 214, 3 L.Ed.2d 199, 205 (1958).

**12.** The rules of construction are ways of finding out the intent. The actual words used are important but insufficient. The report of congressional committees may give some clue. Prior drafts of the statute may show where meaning was intentionally changed. Bills presented but not passed may have some bearing. Words spoken in debate may now be looked at. Even the conduct of the litigants may be important in that the failure of the government to have acted over a period of time on what it now suggests as the proper interpretation throws light on the common meaning. But it is not easy to find the intent of the legislature.

Levi, *An Introduction to Legal Reasoning,* 15 U.Chi.L.Rev. 501, 520 (1948).

**13.** A classic and somewhat cynical inventory of the toolshed is contained in Llewellyn, *Remarks on the Theory of Appellate Decision and the Rules or Canons About How Statutes Are To Be Construed,* 3 Vand.L.Rev. 395 (1950).

**14.** "The bill revises the entire structure of criminal penalties involving controlled drugs . . ." H.R. No. 91–1444, 91st Cong., 2nd Sess. (1970) (hereafter cited as House Report), *reprinted in* [1970] U.S.Code Cong. & Admin.News, pp. 4566, 4570 (legislative history of Drug Control Act).

963. We perceive two lines of precedent, neither of which obviates the need to examine congressional intent.

The first line begins with *Braverman v. United States*, 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23 (1942).[15] There, seven counts of conspiracy were brought under the general federal conspiracy statute, § 37 of the Criminal Code, 18 U.S.C. § 88 (now codified at 18 U.S.C.A. § 371). Each charged a conspiracy to violate a separate provision of the internal revenue law. Only one conspiratorial agreement, involving a scheme to manufacture, transport, and distribute moonshine, was shown by the evidence. The Court held that one agreement to commit seven different statutory offenses could not be punished by more than a single penalty under the general conspiracy statute:

> Since the single continuing agreement, which is the conspiracy here, thus embraces its criminal object, it *differs from* successive acts which violate a single penal statute and from *a single act which violates two statutes.*

*Id.* at 54, 63 S.Ct. at 102, 87 L.Ed. at 28 (emphasis supplied) (citations omitted). Thus *Braverman* was clearly limited to the statutory construction of the general conspiracy statute.[16]

In *United States v. Mori*, 444 F.2d 240 (5th Cir.), *cert. denied*, 404 U.S. 913, 92 S.Ct. 238, 30 L.Ed.2d 187 (1971), this Court extended *Braverman* to a situation involving convictions under the general conspiracy statute and under a specific conspiracy statute, 21 U.S.C.A. § 174. Section 174, now repealed, proscribed conspiracy to import narcotics. The conviction under the general conspiracy statute was somewhat circular, in that it was based on the same substantive crime which was the object of the § 174 conspiracy.[17] We held in *Mori* that under general principles of statutory construction, the specific nature of the importation conspiracy statute precluded additional conviction under the catchall general conspiracy statute. *Id.* at 245.[18] The convictions and concurrent sentences were vacated and the case remanded for imposition of sentence on one count. *But cf. United States v. Nathan*, 476 F.2d 456, 458–59 (2d Cir.), *cert. denied*, 414 U.S. 823, 94 S.Ct. 171, 38 L.Ed.2d 56 (1973) (dual sentences upheld where single conspiracy violated both § 174, proscribing an importation conspiracy, and 18 U.S.C.A. § 371 (the general conspiracy statute), as applied to 26 U.S.C.A. § 4704 (proscribing certain narcotics possession conspiracies)).

---

15. The panel in the case before us considered *Braverman* to state a principle of constitutional double jeopardy, 585 F.2d at 1248–49. *Braverman*, however, did not mention the Double Jeopardy Clause and clearly rested on statutory construction of the general conspiracy provision. *See* text, at 914–916 *infra*.

16. *Braverman* remains a limitation on the Government's ability to fragment a single conspiracy under *the general conspiracy statute*. E. g., *United States v. Tanner*, 471 F.2d 128 (7th Cir. 1972); *Calvaresi v. United States*, 216 F.2d 891 (10th Cir. 1954); *United States v. Cohen*, 197 F.2d 26 (3d Cir. 1952).

*Braverman* did not address the legislative history of the general conspiracy statute. But from this omission it should not be inferred that *Braverman* did not rest on statutory construction, for the practice of explicitly examining legislative history was not so prevalent as it is today. *See United States v. Constantine*, 296 U.S. 287, 298, 56 S.Ct. 223, 228, 80 L.Ed. 233, 240 (1936) (Cardozo, J., dissenting).

17. Clearly only one conspiracy was involved. Section 174 proscribed both the substantive act of importing narcotics and conspiracy to import narcotics. The general conspiracy statute violation was based on a conspiracy to violate the Travel Act, 18 U.S.C.A. § 1952. Section 952 made illegal traveling in foreign commerce to promote unlawful activity. But the unlawful activity was the importation of narcotics in violation of § 174. *United States v. Mori, supra*, 444 F.2d at 242.

18. In distinguishing *American Tobacco Co. v. United States*, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946), we stated that:

> In the instant case, however, we do not have two independent criminal conspiracy statutes. Rather, the defendant herein was indicted under a specific conspiracy statute and a general conspiracy statute. Under general principles of statutory constructions, the catchall provisions of section 371 become subsumed under the particular, specific provisions of section 174.

444 F.2d at 245.

Without any discussion of congressional intent (or double jeopardy), the Sixth Circuit in *United States v. Adcock*, 487 F.2d 637 (1973), became the first to consider dual convictions under the specific conspiracy statutes of the Drug Control Act, 21 U.S.C.A. §§ 846 & 963. The Court held that the evidence established only one conspiracy and that the defendants could not be sentenced both for conspiracy to import and conspiracy to distribute. The Court cited only *Braverman* and *Mori* in support of its holding, and did not address the fact that these earlier cases dealt with the general conspiracy statute. *See United States v. McGowan*, 385 F.Supp. 956, 959 n.5 (D.N.J. 1974) (dictum).[19]

*United States v. Honneus*, 508 F.2d 566 (1st Cir. 1974), *cert. denied*, 421 U.S. 948, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975), marks the end of the first line of decisions.[20] There, the First Circuit also invoked *Braverman* and *Mori*. Three conspiracy convictions were involved: (i) 21 U.S.C.A. § 846 (distribution), (ii) 21 U.S.C.A. § 963 (importation), and (iii) the general conspiracy statute, 18 U.S.C.A. § 371 (for conspiring to smuggle "merchandise" in violation of 18 U.S.C.A. § 545). Congressional intent was only tangentially addressed, as the Court expressed "doubt that [Congress] meant to authorize, or *could* authorize, a court to impose three punishments for one conspiracy." *Id.* at 569 (emphasis supplied). The Court vacated the sentences and remanded for imposition of only one sentence.

Decided four years after *Braverman*, *American Tobacco Co. v. United States, supra*, begins the second line of precedent. There, before reaching the central issue, the Supreme Court decided to "touch upon another contention which the petitioners made and which the government has undertaken to answer." 328 U.S. at 787, 66 S.Ct. at 1128, 90 L.Ed. at 1582. The contention was that *Braverman* laid down an inflexible prohibition against the criminal conviction of both conspiracy to restrain trade (in violation of § 1 of the Sherman Act, 15 U.S.C.A. § 1) and conspiracy to monopolize (in violation of § 2 of the Sherman Act, 15 U.S.C.A. § 2), where but one conspiratorial agreement was shown. The Court disagreed, and refused to extend *Braverman* from its interpretation of the general conspiracy statute to the different statutory scheme of the Sherman Act:

> In contrast to the single conspiracy described in [*Braverman*] in separate counts, all charged under the general conspiracy statute, § 37, Criminal Code, 35 Stat. 1096, 18 U.S.C. § 88 [now 18 U.S.C.A. § 371], *we have here separate statutory offenses*, one a conspiracy in restraint of trade . . ., and the other a conspiracy to monopolize . . . . One is made criminal by § 1 and the other by § 2 of the Sherman Act.

*Id.* at 788, 66 S.Ct. at 1128, 90 L.Ed. at 1582 (emphasis supplied).[21]

---

**19.** Except for dictum in *United States v. Mayes*, 512 F.2d 637, 652 (6th Cir. 1975) (a general conspiracy statute case), the Sixth Circuit has since relied upon *Adcock* in only one case. In *United States v. Fruit*, 507 F.2d 194, 195 (1974), that Court held that only one sentence could stand where a single conspiracy violated the Civil Rights Act's conspiracy statute, 18 U.S.C.A. § 241, as well as 18 U.S.C.A. § 1509, proscribing conspiracy to interfere with a court order. We have tacitly disagreed. *Hayes v. United States*, 464 F.2d 1252 (5th Cir. 1972); *United States v. Hayes and McMaster*, 444 F.2d 472 (5th Cir.), *cert. denied*, 404 U.S. 882, 92 S.Ct. 210, 30 L.Ed.2d 163 (1971). *Fruit* reinforces the notion that *Adcock* was decided without reference to congressional intent, since *Fruit* simply stated *Adcock*'s "one conspiracy, *ergo* one sentence" rule and proceeded to apply

it, despite the differences in the legislation involved.

**20.** *Honneus* was summarily followed by the First Circuit in *United States v. Rivera Diaz*, 538 F.2d 461, 466 (1976). *See also United States v. Cruz Pagan*, 537 F.2d 554, 559 (1st Cir. 1976) (dictum).

**21.** That *Braverman* did not establish an inflexible rule that all conspiracies which either violate separate statutes, or which allege the violation of several statutes as objects of the agreement, must be treated as a single offense was suggested in *American Tobacco Co. v. United States*, 328 U.S. 781, 787, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). Rather, the permissibility of multiple punishments appears to turn upon legislative intent as divined from the statutory scheme set forth by

The Ninth Circuit considered the specific conspiracy statutes before us—21 U.S.C.A. §§ 846 & 963—in *United States v. Marotta*, 518 F.2d 681 (1975). The Court upheld the separate sentences involved by resort to two principles of statutory interpretation. First, it looked to the settled intent of Congress for narcotics legislation prior to the Drug Control Act: to severely punish narcotics trafficking by plugging "loopholes" and turning " 'the screw of the criminal machinery—detection, prosecution and punishment—tighter and tighter.' " *Id.* at 685 (quoting *Gore v. United States*, 357 U.S. 386, 390, 78 S.Ct. 1280, 1283, 2 L.Ed.2d 1405, 1408 (1958)). That intent was deemed to have carried over to the enactment of the two specific conspiracy statutes in the Drug Control Act.[22] The Court also relied on the existence of two separate, distinct and specific statutes to infer that:

> . . . Congress fully intended to permit punishing such conspiracies twice as severely as those which embraced only one of the specified criminal objects. . .

Congress has in effect determined that a conspiracy to import drugs with intent to distribute is twice as serious as a conspiracy to import for personal use or a conspiracy to possess with intent to distribute. .

*Id.* (citation omitted).[23]

■ Endorsing and quoting the reasoning of the Ninth Circuit in *Marotta*, this Court upheld separate punishments under §§ 846 and 963 in *United States v. Houltin*, 525 F.2d 943, 951 (1976), *vacated sub nom. Croucher v. United States*, 429 U.S. 1034, 97 S.Ct. 725, 50 L.Ed.2d 745 (1977).[24] We pointed out that the congressional intent underlying §§ 846 and 963 differed markedly from that underlying the general conspiracy statute:

> [The *Braverman*] holding reflected the Court's view that the congressional intent underlying [the general conspiracy statute] was to adopt the common law definition of conspiracy, thereby proscribing the *agreement* to commit unlawful acts

---

Congress. *Id.* See generally, "Developments in the Law: Criminal Conspiracy," 72 Harv.L.Rev. 921, 963–68 (1959).

*United States v. McGowan, supra*, 385 F.Supp. at 959 n.5.

**22.** *See United States v. Ortiz-Martinez*, 557 F.2d 214, 217 (9th Cir. 1977) (interpreting *Marotta*).

**23.** The Court distinguished *Mori*:

> We adhere to the reasoning in *Mori* in so far as it holds that where specific conspiracy statutes have been enacted, Congress intended to replace and not supplement the general conspiracy statute. However, *Mori* does not aid appellant here who was convicted of violating two specific conspiracy statutes.

*Id.* at 684.

**24.** The case was vacated for reasons unrelated to the issues before us today. In *Houltin* the defendants had earlier been convicted in state court of a charge that was "substantially similar" to the § 846 conspiracy charge. The § 963 conspiracy to import charge was quite distinct from the earlier state court charges, however. Because then-existing guidelines of the Department of Justice did not approve of prosecution under § 846 where a substantially similar con-

viction under state law had been obtained, the Solicitor General asked the Supreme Court to vacate the § 846 conviction:

> We believe, however, that petitioners' prosecution for conspiracy to possess marijuana was not supported by an independent compelling federal interest in light of the substantial similarity between that charge and the offense of which petitioners were convicted in state court. We therefore respectfully request the Court to permit the effectuation of this governmental policy by granting the petition, vacating the judgment of the court of appeals only as to the charge of conspiracy to possess marijuana (count two), and remanding the case to the district court with instructions to grant the government's motion to dismiss that count.

Memorandum by Solicitor General filed with the Supreme Court on Dec. 2, 1976, *quoted in United States v. Houltin*, 553 F.2d 991 (5th Cir. 1977) (on remand). The Supreme Court accordingly vacated the case and remanded to us "for reconsideration in light of the position presently asserted by the government." We in turn remanded to the District Court "with instructions to grant the government's motion to dismiss . . . ." 553 F.2d at 992.

against the United States rather than the unlawful objects themselves.

*Id.* at 951 (emphasis in original).[25]

The Fourth Circuit agreed with our decision in *Houltin*, stating that:

> . . . in enacting the federal narcotics acts the Congress regarded conspiracy to import heroin and conspiracy to distribute heroin in the United States not only as separate offenses but as offenses so compounding each other that a conspiracy embracing each should be treated as two separate conspiracies, warranting the imposition of successive sentences for violations of the two separate conspiracy statutes.

*United States v. Garner,* 574 F.2d 1141, 1147, *cert. denied,* 439 U.S. 936–37, 99 S.Ct. 333, 58 L.Ed.2d 333 (1978). Citing *Simpson,* the Fourth Circuit observed that "[w]hat is required . . . is that *each* separate conspiracy statute be examined to determine the congressional intent with respect to the possible imposition of successive sentences." *Id.* at 1146–47 (emphasis supplied).[26]

We find the latter line of precedent more persuasive because those cases at least attempted to analyze the particular intent of Congress for the statutes at issue: the two specific conspiracy statutes of the Drug Control Act. We do not dispute that the common law principle that a single conspiracy is a single crime does not have some relevance in construing the congressional intent behind any conspiracy statute, and that in the case of the *general* conspiracy statute the common law principle may be the most important evidence of congressional intent. But each conspiracy statute, each statutory scheme has its own characteristics. The statutes before us today are especially unique, so we must apply our tools of statutory construction with an eye to the special circumstances surrounding. this country's narcotics laws and the Drug Control Act.

First is legislative history. The Drug Control Act replaced eighty years of piecemeal attempts by Congress to combat the illegal importation, distribution, and use of narcotics.[27] In 1958, the Supreme Court reviewed the legislative history of those narcotics enactments in *Gore v. United States,* 357 U.S. 386, 388–93, 78 S.Ct. 1280, 1282–84, 2 L.Ed.2d 1405, 1407–10. There the defendant was convicted and consecutively sentenced under three statutes—enacted at different times—for a single sale of narcotics. The Court pointed out that it had considered a number of cases involving

25. *Houltin*'s holding was adopted without comment by *United States v. Dyar,* 574 F.2d 1385 (5th Cir.), *cert. denied,* 439 U.S. 982, 99 S.Ct. 570, 58 L.Ed.2d 633 (1978). We express no opinion today as to *United States v. Smith,* 574 F.2d 308 (5th Cir.), *modified on rehearing,* 594 F.2d 1084, *cert. denied,* 439 U.S. 931, 99 S.Ct. 321, 58 L.Ed.2d 325 (1978) (extending *Houltin* to conspiracy convictions under 21 U.S.C.A. § 846 and 21 U.S.C.A. § 962(d)).

26. Although the denial of certiorari in *Garner* has no precedential value, the views of two Justices are revealed by their dissent from the denial of certiorari. The two Justices argued that certiorari should have been granted on an unrelated ground, but that the consecutive sentence issue was correctly decided by the Fourth Circuit. The writing Justice stated:

> Garner also contends. that the prosecution proved that he participated in no more than one conspiracy. Thus, he argues that he should not have received consecutive sentences after conviction on the two conspiracy counts. I believe the Court of Appeals properly decided this issue, and would limit the grant of certiorari to the evidentiary question.

439 U.S. at 936–37, 99 S.Ct. at 334, 58 L.Ed.2d at 333.

Our survey of existing jurisprudence would be incomplete without mention that the Second Circuit affirmed dual punishment under §§ 846 and 963 in *United States v. Stassi,* 544 F.2d 579 (1976), *cert. denied,* 430 U.S. 907, 97 S.Ct. 1176, 51 L.Ed.2d 582 (1977), although the statutory construction issue was apparently not raised there; and the Eighth Circuit in *United States v. Williams,* 548 F.2d 228, 232–33 (1977), specifically avoided ruling on the issue.

27. The first attempt was the Act of Feb. 23, 1887, Ch. 210, §§ 1–3, 24 Stat. 409, which provided for the forfeiture of any opium shipped between the United States and China. Between 1909 and 1970, a new piece of narcotics legislation was enacted, on the average, every four years. *See* Drug Control Act, Pub.L. No. 91–513, §§ 701, 1101–02, 84 Stat. 1237, 1281, 1291–1294.

"prosecutions under successive enactments dealing with the control of narcotics," and it "was not an innocent in the history of narcotics legislation." *Id.* at 388, 78 S.Ct. at 1282, 2 L.Ed.2d at 1408. Drawing on this experience, the Court concluded that:

> . . . the various enactments by Congress extending over nearly half a century constitute a network of provisions, steadily tightened and enlarged, for grappling with a powerful, subtle and elusive enemy. If the legislation reveals anything, it reveals the determination of Congress to turn the screw of the criminal machinery—detection, prosecution and punishment—tighter and tighter.

*Id.* at 390, 78 S.Ct. at 1283, 2 L.Ed.2d at 1408. The three sentences were affirmed.

Congress's desire to severely punish those involved with narcotics did not abate after *Gore. See, e. g.,* The Narcotics Manufacturing Act of 1960, Pub.L. No. 86–429, 74 Stat. 55; H.R. No. 1486, 89th Cong., 2nd Sess. (1966), *reprinted in* [1966] U.S.Code Cong. & Admin.News, pp. 4245, 4249–50 (legislative history of law creating civil commitment for addicts). The President's Advisory Commission on Narcotics and Drug Abuse, in a report which precipitated the drafting of the Drug Control Act, stated:

> The illegal traffic in drugs should be attacked with the full power of the Federal Government. The price for participation in this traffic should be prohibitive. It should be made too dangerous to be attractive.

House Report, *supra,* [1970] U.S.Code Cong. & Ad.News at 4575. *See also* Note, 1978 B.Y.U.L.Rev. 179.

Against this background of increasingly punitive narcotics legislation, the President proposed on July 14, 1969, a comprehensive Act "providing increased law enforcement authority in the field of drug abuse. . . ." House Report, *supra,* [1970] U.S.Code Cong. & Ad.News at 4567. The proposed legislation had eight sections, denominated titles.[28] Proposed § 501(a) of Title V ("Offenses and Penalties") proscribed distributing, manufacturing, possessing, importing, and exporting of various controlled substances. A single subsection, § 501(c), penalized any substantive act violating § 501(a). Thus the punishment for the substantive act of importing and distributing controlled substances was set out in a single provision of the proposed legislation. Similarly, § 504 made unlawful any conspiracy to "commit any offense defined in this title." Thus a conspiracy to import and distribute controlled substances was proscribed by a single provision, § 504, and punished by another, § 501(c).[29]

In order to conform to the existing jurisdictional lines between the Committee on Ways and Means and the Committee on Interstate and Foreign Commerce, the proposed legislation was split and separately considered by the two House committees. The Ways and Means Committee took jurisdiction over matters relating to import and export of narcotics, and that portion of the legislation was then transmitted to the Interstate and Foreign Commerce Committee, which recombined the legislation. House Report, *supra* at 2–3, [1970] U.S.Code Cong. & Ad.News at 4567–68. The committees' product, except for minor amendment on the floor of the House, was enacted unchanged as the Drug Control Act.

Appellants contend that the existence of two separate and specific conspiracy statutes in the Drug Control Act is the result of the separation of the legislation between the two House committees. Thus they argue that no weight should be accorded the

---

**28.** The proposed titles correspond closely to parts A–E, & G of Title II and parts A & B of Title III of the Drug Control Act, as enacted. *See* S. 2637, 91st Cong., 1st Sess. (1969); H.R. 13742 & 13743, 91st Cong., 1st Sess. (1969).

**29.** Section 504 punished conspiracy by "imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the . . . conspiracy." This provision actually granted greater discretion in sentencing for conspiracy than for a substantive offense, since the penalty imposed under the proposed legislation for most substantive violations called for a *minimum* sentence not merely a maximum.

fact that two provisions exist. They correctly point out that the House Report gives no indication of the intent behind the enactment of two conspiracy provisions. Therefore they claim that the legislative history of the provisions is inconclusive. We disagree. As in *Simpson*, we find the legislative history sparse but sure.

First, this was carefully drafted legislation. The enacted legislation evidences a great deal of coordination between the two committees. Titles II and III of the Drug Control Act contain numerous interrelated provisions. *E. g.*, 21 U.S.C.A. §§ 812, 848, 849, 951, 962 & 965. *See United States v. Gomez-Tostado*, 597 F.2d 170 (9th Cir. 1978) (interaction between the titles). Both titles have parallel penalty structures, imposing similar penalties on similar crimes. *Compare* 21 U.S.C.A. § 841(b)(1)(A) *with* 21 U.S.C.A. § 960(b)(1). This similarity is significant because the penalties are *different* from those proposed by the President and transmitted to the committees. *Compare* 21 U.S.C.A. §§ 841(b), 960(d) *with* § 501(c)(1) of the proposed legislation.[30]

Also indicative of the nonaccidental nature of the two specific conspiracy provisions are the remarks by the sponsor of Title III. Immediately after his introduction of the legislation on the floor of the House, Representative Boggs was permitted to propose several perfecting amendments, which were passed. In proposing the amendments, Representative Boggs stated:

Only the last amendment has any substantive effect. This last amendment provides that section 1013 [now 21 U.S.C.A. § 963]—relating to attempts and conspiracies—and section 1015 [now 21 USCA § 965]—relating to the applicability of title II enforcement and administrative provisions—will take effect at the same time as the comparable provisions of title II.

116 Cong.Rec. 33665 (1970). While these remarks are less probative of a congressional judgment than those in *Simpson, see* note 10, *supra*, and although they "are of course not dispositive of the issue . . . , they are certainly entitled to weight, coming as they do from the provision's sponsor." *Simpson, supra*, 435 U.S. at 13, 98 S.Ct. at 913, 55 L.Ed.2d at 77.

▌ Finding a congressional judgment to permit consecutive punishments under the dual conspiracy statutes is also consistent with the deterrent rationale and the legislative history of other provisions of the Drug Control Act. It is clear that Congress intended the *substantive* act of importation and distribution of controlled substances to be cumulatively punished, in the discretion of the sentencing judge. *United States v. Dubrofsky*, 581 F.2d 208, 213–14 & n.2 (9th Cir. 1978); *United States v. Valot*, 481 F.2d 22, 27–28 (2d Cir. 1973). *Cf. United States v. Hernandez*, 591 F.2d 1019, 1022 & n.9 & 10 (5th Cir. 1979). And like racketeering, *see Callanan v. United States*, 364 U.S. 587, 81 S.Ct. 321, 5 L.Ed.2d 312 (1961), or gambling, *see Iannelli v. United States*, 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975), the danger to society of a conspiracy to commit a specified narcotics offense or offenses is at least as great as the actual offense: Narcotics abuse is "a social evil as deleterious as it is *difficult to combat* . . . ," *Gore v. United States, supra*, 357 U.S. at 389, 78 S.Ct. at 1283, 2 L.Ed.2d at 1408 (emphasis supplied). Against such a difficult foe, cumulative penalties for a *conspiracy* with dual objectives is consistent with the Drug Control Act's cumulation of *substantive* penalties. It is not surprising that Congress intended to allow the District Courts a wide measure of discretion to punish a conspiracy involving such dual objectives, in an appropriate case, by means of consecutive sentences. *Cf. Pot Full of Discretion: Comprehensive Drug Abuse Prevention and Control Act of 1970*, 34 Tex.B.J. 497 (1971).

---

**30.** The proposed legislation permitted imposition of a lighter sentence for conspiracy than for substantive crimes. *See* note 29, *supra*. Reformation of the penalties for substantive acts by both House committees equalized the penalties imposable for conspiracy and substantive crimes. It is significant that neither committee lowered the conspiracy penalty in order to conform to the original, proposed legislation's penalty structure.

Besides legislative history, the application of other tools of statutory construction support our finding that "Congress has in effect determined that a conspiracy to import drugs [and to distribute them] is twice as serious as a conspiracy [to do either object singly]," *United States v. Marotta, supra*, 518 F.2d at 685. As the related principle to that of giving precedence to the specific statute over the general, the existence of two specific provisions within the same comprehensive Act of Congress is a useful tool of statutory construction. As "Congress is predominantly a lawyers' body," *Callanan v. United States, supra*, 364 U.S. at 594, 81 S.Ct. at 325, 5 L.Ed.2d at 317, we may attribute to Congress the intent to permit cumulative punishment where separate and specific statutes are involved. *Cf. Gore v. United States, supra.* Moreover, the state of the law of conspiracy at the time of the Drug Control Act's passage certainly gave fair warning that separate specific conspiracy statutes would permit the cumulative punishment of a single conspiracy. *See American Tobacco Co. v. United States, supra*; Anderson, Wharton's Criminal Law and Procedure § 83 (1957). *Cf. United States v. James*, 161 U.S.App.D.C. 88, 104–05, 494 F.2d 1007, 1025–26 (D.C. Cir.) (cumulative sentences upheld for a single conspiracy violating three separate specific conspiracy statutes of the pre-1970 narcotics law), *cert. denied sub nom., Jackson v. United States*, 419 U.S. 1020, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974).

"Lenity" is another tool of statutory construction. Like the many Courts which have considered narcotics statutes, *see supra*, at 914–915, *United States v. Valot, supra*, 481 F.2d at 27 & n.3, and in accord with the express intent of Congress in the enactment of the Drug Control Act, *see supra*, at 916–917, we question the application of a principle of lenity when Congress has plainly intended severity. Although lenity is a principle, the common meaning of the word suggests "being lenient," "mildness," as opposed to "severity." Webster's New Collegiate Dictionary 481 (1961 ed.). Moreover, in *Gore v. United States, supra*, the Supreme Court contemplated the principle of lenity in the context of the narcotics laws. It concluded:

This situation is *toto coelo* different from the one that led to our decision in *Bell v. United States*, 349 U.S. 81 [75 S.Ct. 620, 99 L.Ed. 905]. That case involved application of the Mann Act—a single provision making it a crime to transport a woman in interstate commerce for purposes of prostitution. We held that the transportation of more than one woman as a single transaction is to be dealt with as a single offense, for the reason that when Congress has not explicitly stated what the unit of offense is, the doubt will be judicially resolved in favor of lenity. It is one thing for a single transaction to include several units relating to proscribed conduct under a single provision of a statute. It is a wholly different thing to evolve a rule of lenity for three violations of three separate offenses created by Congress at three different times, all to the end of dealing more and more strictly with, and seeking to throttle more and more by different legal devices, the traffic in narcotics. Both in the unfolding of the substantive provisions of law and in the scale of punishments, Congress has manifested an attitude not of lenity but of severity toward violation of the narcotics laws.

357 U.S. at 391, 78 S.Ct. at 1283, 2 L.Ed.2d at 1409. Where *separate* and *specific* provisions of the narcotics law are involved, we adhere to *Gore's* view that Congress intended not leniency but rather cumulative penalties.[31]

---

31. *Cf. Jeffers v. United States*, 432 U.S. 137, 156 n.26, 97 S.Ct. 2207, 2219 n.26, 53 L.Ed.2d 168, 184 n.26 (1977) (dictum). An examination of precedent both before and since the Drug Control Act also indicates that the Government has consistently and frequently treated specific

The *Blockburger*[32] test is another tool of statutory construction. "The *Blockburger* test has its primary relevance in the double jeopardy context," *Simpson, supra,* 435 U.S. at 11, 98 S.Ct. at 912, 55 L.Ed.2d at 76, but the test itself derives from a decision involving statutory interpretation.[33] As a tool of statutory interpretation—as opposed to a double jeopardy test—the *Blockburger* test is perhaps less useful than some because it so easily indicates that Congress intended cumulative punishment.[34] Where a comprehensive Act of Congress is involved, however, this criticism has less force and the *Blockburger* test is more probative of intent.

*Blockburger* sets out the technical requirement that each of the two statutory provisions require proof of a fact which the other does not:

Each of the offenses created requires proof of a different element. The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

284 U.S. at 304, 52 S.Ct. at 182, 76 L.Ed. at 309. In *United States v. Cowart,* 595 F.2d 1023 (1979), this Court interpreted the *Blockburger* test to focus on the *elements* of the offense charged, *not* on the evidence adduced at trial. *See also United States v. Nelson,* 599 F.2d 714, 716–17 (5th Cir. 1979); *United States v. Bankston,* 603 F.2d 528, 534 (5th Cir. 1979). At least for purposes of statutory interpretation and where multiple trials are not at issue, we endorse *Cowart's* interpretation of the *Blockburger* test.[35]

It is therefore irrelevant that much of the proof at trial was directed towards both of the conspiracy counts. Appellants' argument[36] that the same overt acts were alleged in each conspiracy count is equally irrelevant to the *Blockburger* test in this situation.[37] Instead, only the ele-

narcotics conspiracy statutes as providing cumulative punishments. *See supra,* at 913–915; *United States v. James, supra.*

**32.** *Blockburger v. U. S.,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

**33.** That the *Simpson* Court may have disdained using *Blockburger* as a test for *statutory construction* is refuted by footnote 4 of that decision, which carefully analyzed the statutes in a *Blockburger* framework. Dictum in *Iannelli v. United States, supra,* 420 U.S. at 785 n.17, 95 S.Ct. at 1293 n.17, 43 L.Ed.2d at 627 n.17, describes the *Blockburger* test as serving a "function of identifying congressional intent to impose separate sanctions for multiple offenses arising in the course of a single act or transaction." *But cf. Jeffers v. United States, supra* (for situations involving multiple trials, *Blockburger* is more than a tool of statutory construction).

**34.** *Cf.* Johnson, *Multiple Punishment and Consecutive Sentences: Reflections on the Neal Doctrine,* 58 Calif.L.Rev. 357 (1970).

**35.** Our decisions have not been completely consistent. All have construed *Blockburger* in its usual double jeopardy context; in that context there may be a distinction between the use of *Blockburger* in situations involving multiple trials as opposed to multiple punishment in one trial. Cases from this Circuit which at least express a view different from *Cowart* include: *United States v. Marable,* 578 F.2d 151 (1978),

and *United States v. Ruigomez,* 576 F.2d 1149 (1978). *Cf. United States v. Stricklin,* 591 F.2d 1112 (5th Cir. 1979). To the contrary are: *United States v. Bankston, supra; United States v. Garcia,* 589 F.2d 249 (5th Cir. 1979); and *United States v. Smith, supra. Cowart* considered and rejected the viewpoint of the Sixth Circuit in *United States v. Austin,* 529 F.2d 559 (1975). Like the Fourth Circuit, *United States v. Peterson,* 524 F.2d 167 (1975), *cert. denied,* 423 U.S. 1088, 96 S.Ct. 881, 47 L.Ed.2d 99 (1976), and, subsequently, the Ninth Circuit, *United States v. Solano,* 605 F.2d 1141 (1979), *Cowart* reasoned that Supreme Court precedent and policy were contrary to the interpretation of *Blockburger* set out by *Austin.*

**36.** Their argument is put forth in the double jeopardy context.

**37.** We recognize some confusion in the Circuit as to whether an indictment charging a conspiracy to violate the Drug Control Act must set out and the Government must prove at least one overt act. Consistent with the majority of our decisions, we now expressly hold that these indictments do *not* require allegation or proof of an overt act. *See, e. g., United States v. Bates,* 600 F.2d 505 (5th Cir. 1979); *United States v. Robinson,* 591 F.2d 1202 (5th Cir. 1979); *United States v. Michel,* 588 F.2d 986 (5th Cir. 1979); *United States v. Thomas,* 567 F.2d 638 (5th Cir. 1978); *United States v. Palacios,* 556 F.2d 1359 (5th Cir. 1977). *See also*

ments set out in the two conspiracy statutes, 21 U.S.C.A. §§ 846 & 963, must be closely compared. It is obvious that each statute requires proof of a common element, the agreement. It is equally obvious that thereafter commonality ends; each requires proof of a *different* objective of the agreement, one to import, the other to distribute. This is true even though the objects of the agreement may partially overlap. *Cf. American Tobacco Co. v. United States, supra,* 328 U.S. at 788, 66 S.Ct. at 1128, 90 L.Ed. at 1582. The *Blockburger* test therefore shows the conspiracy statutes to create separate offenses. As a tool of statutory construction, *Blockburger* supports an intent by Congress to cumulatively punish a conspiracy with the dual objectives of importation and distribution of controlled substances.

■ A number of tools of statutory construction thus lead us to construe sections 846 and 963 to authorize, in the proper case, the imposition of consecutive sentences where a conspiracy with dual objectives is involved. As a result the issue before us broadens and takes on constitutional dimensions.

## II.  *Double Jeopardy's Jaws*[38]

■ The issue which we now must confront is whether the simultaneous trial and subsequent imposition of consecutive sentences for conspiring to achieve different illegal objectives violates the Double Jeopardy Clause. We find that where Congress intended to permit the District Court, in the careful exercise of its discretion, to impose

consecutive sentences, convicting and sentencing a defendant in one proceeding to cumulative punishments does not put the defendant twice in jeopardy. While there are certain prohibitions flowing from other parts of the Constitution, the Double Jeopardy Clause does not protect such a defendant.[39]

We emphasize that the case before us does not involve a number of related but different double jeopardy problems. First, this is not a case where a defendant is tried and sentenced under one statute, serves part or all of that sentence, and then is indicted for the same act under a similar statute. There, the defendant is subjected to the anxiety of not knowing when his punishment will finally end; nor can the sentencing forum ascertain, at any one sentencing, the extent to which the defendant will be punished. Second, this case does not involve retrial following acquittal, which subjects the defendant to "continuing distress" and prevents him from considering the matter closed and planning ahead accordingly. Note, *Twice in Jeopardy, supra* at 277. Nor do we face the imposition of cumulative punishments that Congress either did not intend nor authorize.[40] Instead we address the simultaneous trial and imposition of consecutive sentences where Congress intended, through the enactment of specific provisions in the same piece of legislation, to permit the imposition of longer, consecutive sentences where the sentencing forum deemed it appropriate.

■ An examination of the interests underlying the Double Jeopardy Clause re-

---

*United States v. Umentum,* 547 F.2d 987 (7th Cir. 1976).

**38.** "Shark! Shark!," the captain of the *Labrador* called out as a pre-arranged warning when the Coast Guard and DEA intervened in the off-loading operation. *United States v. Cadena, supra,* 585 F.2d at 1256.

**39.** A number of authors have considered the double jeopardy issue where cumulative punishment occurs: Westen & Drubel, *Toward A General Theory Of Double Jeopardy,* 1978 S.Ct. Rev. 81; Dunsky, *The Constitutionality of Increasing Sentences on Appellate Review,* 69 J.Crim.L. & Criminology 19 (1978); Note, *Dou-*

*ble Jeopardy: Multiple Prosecutions Arising From The Same Transaction,* 15 Am.Crim.L. Rev. 259 (1978); Note, *Twice in Jeopardy,* 75 Yale L.J. 262 (1965). *See also* Notes, 10 Rut.-Cam.L.J. 149 (1978); 52 Wash.L.Rev. 142 (1976). *Cf.* Schwartz, *Multiple Punishment for the "Same Offense": Michigan Grapples with the Definition of a Problem,* 25 Wayne L.Rev. 825 (1979).

**40.** The Due Process Clause affords overlapping protection where a person is cumulatively punished yet the statutes do not authorize such punishment. *See* note 43, *infra.*

veals that its core concern is to protect against subsequent punishment once one has been endured and against subsequent prosecution following acquittal, with some narrow exceptions.[41] The Clause derives from the early English pleas of *autrefois acquit, autrefois attaint,* and *autrefois convict.*[42] *Green v. United States, supra,* 355 U.S. at 187–88, 78 S.Ct. at 223, 2 L.Ed.2d at 204, reviewed the history of the Clause and concluded:

> The constitutional prohibition against "double jeopardy" was designed to protect an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense. . . . The underlying idea, one that is deeply engrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

*Id.* at 187–88, 78 S.Ct. at 223, 2 L.Ed.2d at 204. As articulated by *Green,* the basic interests protected are those of repose and finality.

Although the Supreme Court has yet to squarely consider the Clause's application to cumulative punishments in a single proceeding,[43] it has construed the Clause in a number of recent decisions, some of them relevant to the issue we confront.

The issue in *North Carolina v. Pearce, supra,* was whether a defendant who had been convicted and sentenced, who then served part of that sentence before successfully attacking his first conviction, and who was convicted again, could be given upon resentencing a longer sentence than originally imposed. The case obviously involved the imposition of a second sentence after the first, and presumably final, sentence had been partially served. The defendant's interests in repose and finality were therefore directly at issue. But the defendant, not the Government, sought the appeal which vacated his original sentence, and thus the defendant in a sense waived his interests in repose and finality. The Court found that the defendant did not "waive" his interests to the extent that he expected his appeal to not result in any loss of time already served under the original sentence. Balancing those interests against those of the Government, the Court held that (i)

**41.** Although the issue rarely arises, the Double Jeopardy Clause also precludes sentencing, in a *separate* proceeding, a defendant who has already been sentenced and whose first sentence has not been overturned. *Cf. Ex parte Lange,* 85 U.S. (18 Wall.) 163, 21 L.Ed. 872 (1873).

**42.** A history of these pleas is contained in *Ex parte Lange, supra,* and in Mr. Justice Frankfurter's dissenting opinion in *Green v. United States,* 355 U.S. 184, 198, 78 S.Ct. 221, 229, 2 L.Ed.2d 199, 210 (1957). These were defensive pleas to be interposed only where a second indictment charged the same crime for which "a person . . . has had the benefit of clergy, *and suffered the judgment of the law.* . . ." *Ex parte Lange, supra,* 85 U.S. (18 Wall.) at 169, 21 L.Ed. at 876 (emphasis in original) (quoting 4 W. Blackstone, Commentaries * 315).

**43.** *Ex parte Lange, supra,* is an analogous Supreme Court precedent of earlier vintage. There, the District Court had imposed both the maximum prison term and the maximum fine when the statute permitted imposition of only one. After the defendant had paid the fine and served five days of his prison term, the District Court realized its error and resentenced him to only the prison term. The Supreme Court granted the defendant's subsequent writ of habeas corpus, finding that the resentencing violated the Double Jeopardy Clause. The original sentence exceeded the statutory maximum, a violation of Due Process; and a resentencing resulted in the imposition of a prison term which had been in part already served. *See generally, Dunsky, supra* note 39, at 28–29. *But cf. North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). A factually different case now before the Supreme Court involves an aspect of the issue before us: *Whalen v. United States,* 379 A.2d 1152 (D.C. App.1977), *rehearing en banc denied,* 388 A.2d 894 (1978), *cert. granted,* 441 U.S. 904, 99 S.Ct. 1991, 60 L.Ed.2d 372 (1979), *argued,* 26 Crim.L. Rep. (BNA) 4113 (Nov. 27–28, 1979) (whether, in a single proceeding, consecutive sentences for rape and felony-murder violate double jeopardy).

double jeopardy does *not* preclude imposing a more severe sentence on reconviction but that (ii) it does require that the punishment already endured be subtracted from any new sentence imposed.[44]

A year later, *Ashe v. Swenson*, 397 U.S. 436, 446, 90 S.Ct. 1189, 1195, 25 L.Ed.2d 469, 477 (1970), decided "*not* whether [the defendant] could have received a total of six punishments if he had been convicted in a single trial of robbing . . . six victims." Rather the Double Jeopardy Clause was found to incorporate a rule of collateral estoppel which prevented the State from relitigating an issue which was necessarily determined in a prior trial. Thus the Court did not go so far as to require the joinder of all related prosecutions in one proceeding; but the Court did provide a greater degree of protection to the defendant than *Blockburger's* "same evidence" test (in its constitutional context) would have. *See id.* at 448–60, 90 S.Ct. at 1196–02, 25 L.Ed.2d at 478–84 (Brennan, J., concurring). *Ashe* therefore reemphasized that the core concern of the Double Jeopardy Clause is to fully protect a defendant who has been once acquitted or partially punished under a similar statute for the same act, thus protecting the interests of repose and finality.

*Iannelli v. United States, supra*, was a relatively narrow decision concerning the scope of Wharton's Rule. There, in one proceeding, the defendants were convicted and cumulatively sentenced for running an illegal gambling business in violation of 18 U.S.C.A. § 1955 and of conspiracy (under the general conspiracy statute, 18 U.S.C.A. § 371) to run such a business. Double jeopardy was at issue by way of the argument that Wharton's Rule prohibited such dual convictions and that the Rule was a part of the protection afforded by the Double Jeopardy Clause. The Court found that the Rule did not rest on principles of double jeopardy, 420 U.S. at 782, 95 S.Ct. at 1292, 43 L.Ed.2d at 625, but instead was a tool of statutory construction. The Court then examined the legislative intent, which was found to permit imposition of cumulative sentences. In a long footnote which proved the font of later confusion, *Blockburger* was described *solely* as a tool of statutory construction, although the Court then proceeded to apply the test and find the offenses separate. *Id.* at 785 n. 17, 95 S.Ct. at 1293 n. 17, 43 L.Ed.2d at 627 n. 17. *Iannelli* therefore seemingly limited *Blockburger* and implied that legislative intent was the sole determinant of whether cumulative punishments were permitted, at least in a single proceeding.

Two years later, the Court sought to further clarify *Iannelli*. In *Jeffers v. United States*, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977),[45] the Court affirmed in part and vacated in part the judgment of the Court of Appeals, which had relied upon *Iannelli*. Defendant Jeffers had originally been indicted for conspiracy to distribute narcotics, in violation of 21 U.S.C.A. § 846, and for the greater offense of conducting a continuing criminal enterprise to violate the narcotics laws, in violation of 21 U.S.C.A. § 848. Jeffers opposed the Government's efforts to try the two charges in one proceeding. Consequently, he was tried first for § 846 conspiracy, and after conviction was brought to trial on the § 848 charges, which resulted in a second conviction. The punishments were made consecutive: (i) for § 846, 15 years in prison, a special parole term, and a $25,000 fine; (ii) for § 848, life imprisonment and a $100,000 fine. The defendant appealed, contending that his § 848

---

44. The Court also held that the Due Process Clause required any increased sentence on retrial to have been based on objective, identifiable factual information which was not known to the sentencing judge at the time of the original sentencing, and that such information had to be disclosed on the record. 395 U.S. at 723–26, 89 S.Ct. at 2079–81, 23 L.Ed.2d at 668–70. *See also Chaffin v. Stynchcombe*, 412 U.S. 17, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973).

45. *Jeffers* also interpreted the decision simultaneously decided, *Brown v. Ohio*, 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977). In discussing and distinguishing *Brown*, the *Jeffers* plurality stated: "What lies at the heart of the Double Jeopardy Clause is the prohibition against multiple prosecutions for the 'same offense.'" 432 U.S. at 150, 97 S.Ct. at 2216, 53 L.Ed.2d at 180.

conviction and sentence violated the Double Jeopardy Clause.

The Supreme Court first dealt with the defendant's claim that a second *prosecution* was improper. In contrast to the Court of Appeal's holding that legislative intent controlled the reprosecution issue, the Supreme Court held that *Blockburger,* in its constitutional context, should be used. The Supreme Court found the offenses to be the "same" under that test, but nevertheless upheld the separate prosecutions because the defendant had essentially waived his rights by opposing the Government's attempts to consolidate the charges.[46]

Having resolved the reprosecution issue, the Court was left with the problem of the cumulative punishments which the defendant received. This was a problem similar to the one before us today—whether double jeopardy precludes cumulative punishment where a defendant is tried under two separate statutes in one proceeding.[47] *Jeffers* treated this problem as one entirely separate from the more central reprosecution issue. In resolving the problem of cumulative punishment, *Jeffers* unmistakenly looked only to congressional intent:

> The critical inquiry is whether *Congress intended* to punish each statutory violation separately. . . . In *Iannelli v. United States,* the Court concluded that *Congress did intend* to punish viola-

tions of § 1955 separately from § 371 conspiracy violations. Since the two offenses were different, there was no need to go further. . . . If some possibility exists that two statutory offenses are the "same offense" for double jeopardy purposes, however, it is necessary to examine the problem closely, in order to avoid constitutional multiple punishment difficulties. See *North Carolina v. Pearce,* 395 U.S. at 717 [89 S.Ct. at 2076]; *United States v. Wilson,* 420 U.S. [332] at 343 [95 S.Ct. 1013 at 1021, 43 L.Ed.2d 232].

432 U.S. at 155, 97 S.Ct. 2218, 53 L.Ed.2d at 183 (citations and footnote omitted) (emphasis supplied).[48]

The meaning of the above quoted passage is indicated by the fact that immediately thereafter the opinion proceeded to analyze the words of the two statutes and their legislative history. The intent of Congress was the "critical inquiry." *Jeffers* concluded that Congress had *not* intended to allow cumulative imposition of the $25,000 and $100,000 fines.[49] Consequently the Court ordered that the fine assessed not exceed $100,000, although the prison sentences were affirmed.

■ *Jeffers* therefore teaches that the analysis of reprosecution following conviction on similar charges or following acquittal[50] is entirely separate from that of

---

**46.** The waiver reasoning was the product of four Justices, while Mr. Justice White concurred only in the result of that reasoning. *See* 432 U.S. at 159 n. 7, 97 S.Ct. at 2227 n. 7, 53 L.Ed.2d at 186 n. 7 (Stevens, J., dissenting in part and concurring in part in the judgment).

**47.** "[B]oth parties . . . appear to have assumed that no cumulative punishment problem is present in this case,[23] . . . ." *Id.* at 154, 97 S.Ct. at 2218, 57 L.Ed.2d at 182. In the footnote 23 the Court elaborated: "Even if the two indictments had been tried together, the cumulative-punishment issue would remain."

**48.** The last quoted sentence refers to the *Pearce* problem, not relevant in *Jeffers* nor in the case before us.

Mr. Justice White, concurring in part and dissenting in part, supported reliance on congressional intent but reached a different conclusion as to the nature of that intent.

**49.** In a relevant footnote the Court observed:

> The Congress was plainly interested in punishing the professional criminal severely when it passed § 848. . . . Taken alone, this might support an argument for cumulative penalties. . . ."

432 U.S. at 156 n. 26, 97 S.Ct. at 2218 n. 26, 53 L.Ed.2d at 184 n. 26 (citations omitted). The Court found explicit legislative history suggesting that the fines not be cumulative, however. Consequently, the Court did not find sufficient legislative history favoring cumulative punishments.

**50.** Reprosecution is the core of the Double Jeopardy Clause, and there the Clause— through the *Blockburger* test and the principle of *Ashe v. Swenson, supra*—acts as a limitation on Congress and the Government.

cumulative punishments, rendered in a single proceeding. The cumulative punishment issue requires an analysis of legislative intent—albeit an intent found lacking in *Jeffers*. The principle is therefore that the Double Jeopardy Clause requires only that courts punish within the limits that Congress intended. Cumulative punishment, when imposed in one proceeding (or in separate proceedings as the result of a defendant's desire to have the proceedings separate), is proper so long as Congress intended to permit such cumulative punishment.

As further support for this interpretation, we borrow an argument from *Gore v. United States, supra*, 357 U.S. at 392–93, 78 S.Ct. at 1284–85, 2 L.Ed.2d at 1410–11, where the Court upheld three cumulative sentences imposed for a single sale of narcotics. The argument, as adapted, asks us to suppose that Congress, instead of enacting 21 U.S.C.A. §§ 846 & 963, enacted the following:

> Any person who enters into a conspiracy to both import and to distribute marijuana is punishable by a term of imprisonment of not more than 10 years, a fine of not more than $30,000, or both: *Provided, however*, That if he conspires only to import marijuana he is only punishable by a term of imprisonment of up to 5 years, a fine of not more than $15,000, or both: *Provided, however*, That if he conspires only to distribute marijuana he is only punishable by a term of imprisonment of up to 5 years, a fine of not more than $15,000, or both.

As *Gore* held, there clearly would be no double jeopardy problem were the defendants sentenced under such a statute. Yet it has been shown that such a statute was what Congress intended to effect in enacting the two specific conspiracy statutes contained in the Drug Control Act. *See United States v. Marotta, supra.*

Appellants argue, however, that more than congressional intent is involved; that the *Blockburger* test must be applied even

where reprosecution is not at issue. They, like the panel, 585 F.2d at 1248–49, rely on *Braverman* for the proposition that a single conspiracy with dual objectives is but one offense, which Congress *cannot* further fragment. But as cogently observed by Westen and Drubel, *supra* note 39, at 113–15:

> . . . [T]his thesis assumes that "same offense" has substantive content that is independent of domestic law as defined by the legislature, [thus demanding] more of the Double Jeopardy Clause than it is capable of supplying.

> . . . [T]he argument assumes that the Double Jeopardy Clause is capable of reducing the concept of a criminal offense to its smallest rational unit, or atom, beyond which further fragmentation cannot occur without creating a "doubling effect."

> *     *     *     *     *     *

> . . . The flaw . . . is to assume that there is an objective basis for determining the maximum number of statutory offenses implicit in a single course of conduct. There is simply no way to make sense out of the notion that a course of conduct is "really" only one act.

In deference to this observation, we feel that the Supreme Court in action as well as words[51] has recognized that the Double Jeopardy Clause imposes no limits on Congress's power to define the allowable unit of prosecution and punishment, at least so long as all charges are brought in a single proceeding. This is not to say that Congress could so fragment a conspiracy that the aggregate punishment becomes cruel and unusual, but protection from that action derives from the Eighth Amendment, not the Double Jeopardy Clause. *See United States v. Marotta, supra* at 685.

Nor would the *Blockburger* test afford protection if applied to the conspiracy statutes here. For, as indicated, *supra* at 919, each statute requires an element that the

---

51. *See also Sanabria v. United States*, 437 U.S. 54, 169, 98 S.Ct. 2170, 2181, 57 L.Ed.2d 43, 57 (1978); *Brown v. Ohio, supra*, 432 U.S. at 165, 97 S.Ct. at 2225, 53 L.Ed.2d at 193–94.

other does not. We look to the elements of the statute, not the evidence adduced at trial. *United States v. Cowart, supra.* The difference in the objectives of the conspiracy would in any event satisfy the *Blockburger* test.[52]

We conclude with a cautionary admonition. First, our holding that double jeopardy is not offended by these conspiracy charges brought in a single proceeding does not extend to the multiple prosecution area, and the Government would be well-advised to bring all of its charges (relating to a single conspiracy) in a single proceeding. *Cf. Ashe v. Swenson, supra.* Second, we caution the District Courts that our holding does not require the imposition of consecutive sentences but rather only permits such imposition, within the sound discretion of the sentencing forum.[53]

The result of our decision today is to alter the panel's reasoning while reaffirming its disposition of the convictions and sentences of the four defendants. Thus we let stand the panel's reversal of the convictions of Smigowski and Martins with respect to Count II and the affirmance with respect to Count I. The convictions and sentences under both counts of Rodriguez and Albernaz are affirmed. As did the panel we direct that the case be remanded with instructions to dismiss the Count II convictions of Smigowski and Martins.

AFFIRMED IN PART, REVERSED IN PART and REMANDED.

ALVIN B. RUBIN, Circuit Judge, dissenting:

The offense of conspiracy lies in the agreement alone. *United States v. Alvarez,*

610 F.2d 1250 (5th Cir. 1980); *United States v. Suarez,* 608 F.2d 584 (5th Cir. 1979); *see United States v. Falcone,* 109 F.2d 579 (2d Cir.), aff'd, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940). It "is an inchoate offense, the essence of which is an agreement to commit an unlawful act." *Iannelli v. United States,* 420 U.S. 770, 777, 95 S.Ct. 1284, 1289, 43 L.Ed.2d 616, 622 (1975); *accord, United States v. Conroy,* 589 F.2d 1258, 1269 (5th Cir.), *cert. denied,* —— U.S. ——, 100 S.Ct. 60, 62 L.Ed.2d 40 (1979).

As the majority opinion makes clear, the defendants were charged with entering into only one agreement, and only one agreement was proved; that agreement had two objectives, importing marijuana and distributing it.[1] Though the charge described overt acts, it was unnecessary for the prosecution to charge or to prove any act in furtherance of the conspiracy (majority opinion, n. 37 *supra*) and, therefore, according to the majority's opinion, the single agreement itself constituted two crimes, punishable twice, the instant there was assent, whether express or by wink or handshake, and whether or not anything further was ever done to accomplish the illicit bargain. For that one agreement the defendants were charged with violating two separate provisions enacted by a single law, convicted of violating both and sentenced to separate and consecutive sentences.

I respectfully disagree with what seems to me to be both an erroneous conjecture of the unarticulated purpose behind enactment of the statute and a failure to grant the defendants the protection of the double jeopardy clause.[2]

---

**52.** We do not find that a single sentence of "dictum-on-top-of-dictum" changes our reliance upon the intent of Congress: "The Double Jeopardy Clause is no less offended because the Government here seeks to try petitioner twice for this single offense, instead of seeking to punish him twice as it did in *Braverman.*" *Sanabria v. United States, supra,* 437 U.S. at 74, 98 S.Ct. 2184, 57 L.Ed.2d at 60.

**53.** We have considered appellants' argument of prosecutorial abuse of discretion, and find it without merit. *Cf. United States v. Batchelder,* 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755

(1979); *United States v. Brown,* 602 F.2d 909 (9th Cir. 1979).

**1.** The offense of conspiracy to *distribute* was inferred from the quantity of marijuana involved in the conspiracy to import.

**2.** Although I follow the lead of my brethren by separately discussing congressional intent and the double jeopardy issue in this case, I believe an overly sharp distinction may depreciate the significance of the double jeopardy clause in matters of statutory interpretation. If the clause has any effect on the decision whether

Each of the sections of the law which the defendants were convicted of violating, 21 U.S.C. §§ 846 and 963, prohibits a conspiracy to violate any provision of the Title in which it is contained. Each is contained in a different Title of a single law, the Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub.L. No. 91–513, 84 Stat. 1236. Each manifests an intention by Congress, in dealing with illegal traffic in drugs, to strike against group activity in drug traffic. Ordinarily, a single section forbidding any conspiracy to violate substantive provisions of the Comprehensive Drug Abuse Prevention and Control Act of 1970 would have sufficed to address the problem. However, because the responsibility for drafting the importation and distribution provisions in the Act was divided between two congressional committees, each committee was careful to ensure that a conspiracy to violate the provisions it drafted was made illegal. From this accident of legislative development of the statute and Congress's failure in reviewing the work of its two committees to consolidate the twin conspiracy provisions that resulted, my brethren now conclude by a grudging reading of Supreme Court precedent that a single conspiracy to violate the provisions of the Act can be punished twice.

They reach this troubling result by saying that the conspiracy sections of the statute proscribe "*acts* of thought and agreement." Majority opinion, slip op. p. 911 *supra* (Emphasis supplied). Leaving aside the patently dubious proposition that "acts of thought" may ever be made criminal, calling an agreement an act may accommodate our customary taxonomy but it does not alter the nature of the offense. What is proscribed by criminalization of conspiracy is the purely consensual compact to engage in a crime. One illegal agreement must be distinguished, as the Supreme Court has told us, "from a single act which violates two statutes." *Braverman v. United States*, 317 U.S. 49, 54, 63 S.Ct. 99, 102, 87 L.Ed. 23, 28 (1942).

My brethren acknowledge the authority of *Braverman* but make an effort to distinguish it, saying that it limits only "the Government's ability to fragment a single conspiracy under *the general conspiracy statute.*" Majority opinion, n. 16 *supra* (their emphasis). This is not an adequate basis for reaching a different result from the one determined in *Braverman.* Here there was but one conspiracy regardless whether it is declared illegal by what my brethren consider two discrete laws, 21 U.S.C. §§ 846 and 963, or by one law, former 18 U.S.C. § 88, considered in *Braverman.* Cf. *Developments in the Law—Criminal Conspiracy*, 72 Harv.L.Rev. 920, 964–966 (1959); W. LaFave & A. Scott, Handbook on Criminal Law § 62, at 479–480 (1972). Moreover, I submit that the provisions we here consider are in fact but two parts of one law, Pub.L. No. 91–513 (1970), although that enactment was divided into multiple sections. However, whether there was one statute or two, there was one agreement and, as the court said in *Braverman*: "[t]he one agreement cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than one." 317 U.S. at 53, 63 S.Ct. at 102, 87 L.Ed. at 28. I see little difference between fragmenting a conspiracy according to the number and diversity of its objectives in order to charge several violations of a single statute, and using the same technique to charge violations of two statutory provisions. The teaching of *Braverman* is that a conspiracy cannot be so fragmented.

to cumulatively punish behavior that may violate two statutory sections, at the least it demands that the rules of statutory interpretation should be weighed most favorably to a defendant in determining what Congress intended. Cf. *Simpson v. United States*, 435 U.S. 6, 98 S.Ct. 909, 914, 55 L.Ed.2d 70 (1978); *Bell v. United States*, 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955). *See generally* Westen & Drubel, *Toward a General Theory of Double Jeop-* ardy, 1978 Sup.Ct.Rev. 81, 106–24. I think by their sharp distinction between statutory interpretation and the force of the double jeopardy clause, my brethren fail to give it even this minimal effect. This is particularly distressing since our very discretion to interpret statutes to permit double punishment is one of the exercises of power the double jeopardy clause seeks to restrain. *See Brown v. Ohio*, 431 U.S. 161, 165, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187, 193 (1977).

If, as the majority finds, *Braverman* is limited to the interpretation of one statute, the general conspiracy statute, and its rule is to be distinguished from the interpretation of two separate sections of a law enacted by a single vote of Congress, nothing in it tells us so. If Congress in the Comprehensive Drug Abuse Prevention and Control Act of 1970, intended to adopt a different policy from the purpose that the Supreme Court had found in the statute construed in *Braverman*, it failed to say so in the statute and nothing in the legislative history, so extensively examined by the majority, supports the view that Congress merely failed to articulate its intention. Both statute and congressional proceedings are simply silent. If, in this instance, silence speaks louder than words, what it says is that we should not consider it eloquent of a purpose to change.

That Congress intended to punish severely those involved in the drug trade is evident. It demonstrated this intention not only by enacting the drug control law but by the penalties permitted in that law. That Congress made criminal both a conspiracy to import a controlled substance and a conspiracy to distribute it is patent. Finally, it is clear that Congress intended to permit separate punishments for the substantive *acts* of importation and distribution of controlled substances (incorrectly, I suggest, referred to by the majority as "the substantive *act* of importation and distribution," majority opinion, slip op. p. 917 *supra* (emphasis changed), for one can hardly import and distribute by a single act).

However, those premises do not lead to the conclusion that, *therefore*, Congress intended to permit *one agreement* to be prosecuted under two sections of the same law and punished by two consecutive sentences.

*Cf. Jeffers v. United States*, 432 U.S. 137, 156 n. 26, 97 S.Ct. 2207, 2219 n. 26, 53 L.Ed.2d 168, 184 n. 26 (1977) (Congress's intent to punish severely in drug cases does not conclusively determine that it intended cumulative penalties). As the majority cautiously observes, Congress is a body of lawyers. As such it can be expected, indeed presumed, to be aware that a conspiracy statute outlaws the agreement itself, and not to intend, by a division of drafting responsibility, to permit courts to punish a single agreement twice. The majority's conclusion, I respectfully submit, is not supported by any express statutory provision or by legislative history and is "based on no more than a guess as to what Congress intended," *Ladner v. United States*, 358 U.S. 169, 178, 79 S.Ct. 209, 214, 3 L.Ed.2d 199, 205 (1958).

Of course, if there are two separate and distinct conspiratorial agreements, then there are two crimes. This was the situation in *American Tobacco Co. v. United States*, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). Although the opinion in that case does not tell us whether the theory of the prosecution was that there were two agreements or merely one, the instructions to the jury, published in ABA Section of Antitrust Law Jury Instructions in Criminal Antitrust Cases 180–81, (1965), make it clear that two separate conspiracies were charged.[3] This is the basis for the Court's statement in the *American Tobacco* opinion that the convictions for conspiracy to monopolize and conspiracy in restraint of trade required "proof of *conspiracies* which are reciprocally distinguishable from and independent of each other although the objects of the conspiracies may partially overlap." 328 U.S. at 788, 66 S.Ct. at 1129, 90 L.Ed. at 1582 (emphasis supplied). No such showing was made in this case.

---

**3.** The Supreme Court also reads *American Tobacco* to allow cumulative punishment only of two separate conspiracies. In *Sanabria v. United States*, 437 U.S. 54, 98 S.Ct. 2170, 2184, n. 33, 57 L.Ed.2d 43, 60 n. 33 (1978), considering a conviction for the substantive crime of conducting an illegal gambling business, it said, "If two *different* gambling businesses were alleged and proven, separate convictions and punishments would be proper" (emphasis in

original) (citing *American Tobacco*), and characterized *American Tobacco* as "holding *Braverman* inapplicable where two distinct conspiracies [are] alleged." It continued, "It is not always easy to ascertain whether one or more gambling businesses have been proven under [18 U.S.C.] § 1955. . . . *No such difficulties are presented here because both sides agree that only a single gambling business existed.*" *Id.* (emphasis supplied).

My brethren fully sum up the divergent results reached by the other circuit courts. All of these courts agree, however, that Congress has the power to enact overlapping statutes and that defendants can be prosecuted and convicted under each simultaneously, for it might be difficult or impossible for the grand jury definitely to determine in advance which set of laws the conspiracy would violate if proved. Accepting this, the final question is the one here presented; I believe the sounder view of statutory construction is that, if the defendants are convicted of violating both provisions by a single agreement, they can be sentenced only once, whether tried in a single or separate trial.

In interpreting statutes making criminal such essentially preparatory conduct as conspiracy, we must balance interests, weighing both the threat created by intrigue to violate the law and the consideration that the legislature has outlawed a simple concert of minds and words. The implications of making not one but two crimes out of a purely verbal agreement, and, indeed, of what my brethren even embrace as the parties' "thoughts," ought to be considered in evaluating congressional intent and in reading the fifth amendment.

Because the interpretation of the two sections to permit the imposition of two sentences for one agreement would raise serious constitutional questions concerning double jeopardy, and because it is not clear either from the statute or its history that Congress intended this result (as distinguished from a general purpose of punishing severely those engaged in drug trade and attempting to control that trade), I would resolve this case by construing the statute so as to avoid the constitutional

issue. *See Simpson v. United States*, 435 U.S. 6, 11–13, 98 S.Ct. 909, 912–913, 55 L.Ed.2d 70, 76–77 (1978); *Jeffers v. United States*, 432 U.S. 137, 155, 97 S.Ct. 2207, 2218, 53 L.Ed.2d 168, 182 (1977).

However, if we accept the construction adopted by the majority and conclude that Congress intended to permit one agreement to be punished by the court as two crimes, we must consider whether this result was forbidden by the double jeopardy clause of the sixth amendment.

While the "core concern" of the double jeopardy clause is to protect against successive trials, the present Supreme Court, like its predecessors, considers it also to prohibit multiple punishment for the same offense. "The Double Jeopardy Clause," the Court observed in *Simpson v. United States*, 435 U.S. 6, 11 n. 5, 98 S.Ct. 909, 912 n. 5, 55 L.Ed.2d 70, 76 n. 5 (1978), " 'protects against multiple punishment for the same offense,' *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969), and prohibits multiple prosecutions for the 'same offense,' *Jeffers v. United States*, 432 U.S. 137, 150–151, 97 S.Ct. 2207, 2216, 53 L.Ed.2d 168 (1977)." (Emphasis supplied.) If that were doubtful, we could turn to the even more detailed but no less explicit language in *North Carolina v. Pearce*, 395 U.S. 711, 716, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656, 664 (1969), quoted in the footnote.[4]

This is no new doctrine. It was announced when *Ex parte Lange*, 85 U.S. (18 Wall.) 163, 21 L.Ed. 872, was decided in 1874: [T]he Constitution was designed as much to prevent the criminal from being twice punished for the same offense as from being twice tried for it." 85 U.S. at 173, 21 L.Ed. at 878.

4. "The Court has held today, in *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707, that the Fifth Amendment guarantee against double jeopardy is enforceable against the States through the Fourteenth Amendment. That guarantee has been said to consist of three separate constitutional protections. It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. *And it protects against*

*multiple punishments for the same offense." North Carolina v. Pearce*, 395 U.S. 711, 717 & n. 11, 89 S.Ct. 2072, 2076 & n. 11, 23 L.Ed.2d 656, 664 (1969) (emphasis supplied, footnotes omitted) (citing *Ex parte Lange*, 18 Wall. 163, 21 L.Ed. 872; *United States v. Benz*, 282 U.S. 304, 307, 51 S.Ct. 113, 114, 75 L.Ed. 354; *United States v. Sacco*, 2 Cir., 367 F.2d 368; *United States v. Adams*, 6 Cir., 362 F.2d 210; *Kennedy v. United States*, 9 Cir., 330 F.2d 26).

None of these cases considered factual situations identical to the one before us. Yet they and the host of other double jeopardy decisions reviewed by my brethren rest on the thesis that two punishments for one offense violate the double jeopardy clause. A fundamental provision of the Bill of Rights should not be applied narrowly as a result of a fastidious effort to distinguish each possible precedent.[5]

The majority opinion concludes, "*[T]he Double Jeopardy Clause imposes no limits on Congress's power to define the allowable unit of prosecution and punishment, at least so long as all charges are brought in a single proceeding.*" P. 924 *supra* (emphasis supplied). I take it that they would add that the double jeopardy clause does not limit the power of the courts to impose separate punishments for all charges brought in a single proceeding. This is the crux of our difference. I submit that, however difficult it may be to define "units of prosecution," if the crime is conspiracy and there is but one agreement, there can be but one punishment even though there may be multiple charges; the imposition of two sentences is double jeopardy.

In this respect the analogy between a conspiracy and a substantive crime is misleading. Conspiracy, like attempt, stigmatizes a nascent offense. *Alvarez v. United States*, 610 F.2d 1250 (5th Cir. 1980). A single *act* may constitute two offenses if it violates two *substantive* statutes. This may be the result if the act has two separate consequences, and each consequence of the act completes a different crime. If a defendant kills two persons by one gun shot, the offense of homicide is not completed merely by pulling the trigger; it is the act of shooting the gun and the resultant death that together constitute homicide. *See Gore v. United States*, 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958), (involving the violation of several substantive statutes by one act of sale). An act may also be a course of conduct, each separate facet of which may be a crime.

We need not at this time explore all of the difficult and, to some extent, still unresolved problems of whether and to what extent the double jeopardy clause acts as a restraint on the power of Congress to define what is the criminal conduct punished and to divide a single act or course of activity into fragments or units of punishment, each labelled a separate crime, provided only that Congress do so with sufficient clarity and demonstrated purpose. We here consider only conspiracies, that is, agreements. Agreements are not acts. Even if a single *agreement* has more than one unlawful *objective* it does not truly constitute more than one *conspiracy*; it is the *agreement* per se that is illegal in a conspiracy and indeed, is coextensive with it.[6]

---

**5.** The labor my brethren take to distinguish *Iannelli v. United States*, 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975), and *Jeffers v. United States*, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977), seems to me ill-spent. *Iannelli* turns only on statutory construction, and *Jeffers*, a successive prosecution case, likewise dealt solely with statutory construction. *Jeffers* fairly read, I submit, does not "[teach] that the analysis of reprosecution following conviction on similar charges or following acquittal is entirely separate from that of cumulative punishments, rendered in a single proceeding," majority opinion, pp. 923–924 *supra* (footnote omitted). *Gore v. United States,* 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958) does put emphasis on statutory construction, but it later makes clear that there is double jeopardy if a person is punished for "different descriptions of the same offense" and not for each of several separate offenses. *Id.* at 392, 78 S.Ct. at 1284, 2 L.Ed.2d at 1410.

**6.** Of course, the difficulties inherent in saying any physical act cannot be divided into more than one offense are well-known. *See Gore v. United States*, 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958); Westen & Drubel, *supra*, note 2. But it requires a metaphysician or a neuropsychologist to find the same difficulty with "acts of thought." I believe this is a proper case to conclude that a single, simple agreement cannot be fragmented into multiple crimes by Congress or the courts. Although the Supreme Court has never directly addressed the limits "imposed by the Double Jeopardy Clause on the legislative power to define offenses," *Sanabria v. United States*, 437 U.S. 54, 69, 98 S.Ct. 2170, 2181, 57 L.Ed.2d 43, 57 (1978), neither has it concluded, as the majority appears to, that there are no such limits.

If Congress wished to increase the permissible penalty for conspiracy to import marijuana from five years to 15 years, or to impose any other penalty short of one forbidden as cruel and unusual punishment, it might do so.[7] If it wished to increase the penalty for a conspiracy to distribute, it might do so. What it cannot do is legislatively to give a court power to punish doubly for a single violation of the law.

All law, but particularly the criminal law, is and ought to be founded in good sense. Its intricacies ought at least to be explicable. The majority opinion almost recognizes explicitly that, if the government had chosen to prosecute the defendants for conspiracy to import and then separately for conspiracy to distribute, this would violate the Constitution. They pause on the brink of going quite that far by a "cautionary admonition" to the government, suggesting that it "would be well-advised to bring all of its charges (relating to a single conspiracy) in a single proceeding," majority opinion p. 925 *supra.*

Why there would be double jeopardy if the same court were to impose two sentences after two trials and not if it were to impose two sentences after one is difficult to comprehend. To conclude that the double jeopardy clause protects one agreement from successive prosecutions but that, if the government elects to prosecute that same agreement under two separate counts in a single case, the judge can impose a double sentence appears to me to offend the logic that should govern constitutional interpretation. It is no easier to characterize the two crimes here charged as the "same offense" under the fifth amendment for prosecution than it is for punishment. *See Sanabria v. United States,* 437 U.S. 54, 98 S.Ct. 2170, 2184, 57 L.Ed.2d 43 (1978).

Even in construing laws designed to protect our shores against importers of a noxious weed, we must apply proper standards of statutory interpretation and fundamental constitutional principles or we are in jeopardy of succumbing to the temptation of making the punishment fit what we believe to be the crime.

---

7. The terms of imprisonment for the three defendants who received consecutive sentences on the conspiracy counts each exceeded the statutory maximum for either conspiracy to import marijuana or conspiracy to distribute. Rodriguez was sentenced to imprisonment for four and one-half years on each count, the sentences to be served consecutively. Alber-

naz was sentenced to imprisonment for three and one-half years (42 months) on each count, the sentences to be served consecutively. Smigowski was sentenced to imprisonment for three years on each count, the sentences to be served consecutively. Martins was sentenced to three years on each count, the sentences to be served concurrently.